Constance **BREWER**, Plaintiff–Appellant,

v.

Shirley S. **CHATER**, Commissioner,
Social Security Administration,
Defendant–Appellee.

No. 96–1393.

United States Court of Appeals,
Seventh Circuit.

Argued May 29, 1996.

Decided Jan. 9, 1997.

situation has been limited by Congress to the courts of appeal...."); *Grutka,* 549 F.2d at 8

(same).

Daniel R. Bourke, Karen L. Sherman (argued), Chicago, IL, for plaintiff–appellant.

Aryka S. Radke (argued), Department of Health and Human Services, Region V, Office of General Counsel, Thomas P. Walsh, Office of United States Attorney, Civil Division, Chicago, IL, for defendant–appellee.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

Constance Brewer was the self-employed owner and operator of a dry cleaning establishment and of a tax form preparation business. When she developed a heart condition, she stopped working in those businesses and sought disability insurance benefits ("DIB"). The Commissioner of the Social Security Administration ("SSA") determined that Ms. Brewer was not entitled to DIB.[1] The claim-

---

1. The administrative determination denying benefits to Ms. Brewer was made by the Secretary of Health and Human Services, Donna E. Shalala. Effective March 31, 1995, however, during the pendency of the district court's judicial review, the duties of the Secretary were transferred to the Commissioner of Social Security, Shirley S. Chater, pursuant to the Social Security Independence and Program Improvements Act of 1994, P.L. No. 103–296, 108 Stat. 1464. The district court substituted Commissioner Chater for Secretary Shalala as the defendant in this action. For ease of exposition, in the text we refer to the Commissioner rather than the Secretary. *See Rohan v. Chater*, 98 F.3d 966, 967 n. 1 (7th Cir.1996).

ant then sought judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) of the Social Security Act. The district court, presented with cross motions for summary judgment, granted judgment to the Commissioner. Ms. Brewer now appeals to this court. For the reasons that follow, we affirm the judgment of the district court.

## I

## BACKGROUND

Constance Brewer first applied for disability insurance benefits on February 12, 1992, alleging that she had become totally disabled on February 8, 1992. Her disability report stated that her disabling conditions were a heart condition and high blood pressure. Ms. Brewer was unsuccessful at every stage in the claim process. Her application was denied initially, and upon reconsideration, by the Regional SSA Commissioner. An Administrative Law Judge ("ALJ") then conducted a hearing on her claim; he decided that Ms. Brewer was not entitled to disability benefits. The Appeals Council found no basis for reviewing the ALJ's decision and accepted it as the final decision of the Commissioner. When Ms. Brewer sought judicial review of that final determination, the district court granted summary judgment to the Commissioner. We now consider her appeal of that decision.

### A. *Facts*

#### 1. Disability Report

Ms. Brewer was born in 1933; she was fifty-eight years old when she filed her DIB application claiming disability from high blood pressure and a heart condition. In her disability report, she stated that she has a high school education and has taken some college courses and vocational training in tax preparation from H & R Block. She owned and operated a dry cleaning business between 1964 and 1992. In addition, she pre-

pared simple tax forms for H & R Block from 1974 to 1979 and began her own tax preparation business in 1980. In August 1991, however, Ms. Brewer reduced her work hours from 48 hours to 20 hours a week because she no longer could stand for a long time or operate the press machine. She stated that she felt tired, dizzy and unbalanced, and that her heart and pulse would beat fast.[2] On February 8, 1992, she closed her dry cleaning business.[3]

In her disability report Ms. Brewer described her basic duties: She "used cleaning machines, took care of the bookkeeping books, did income tax from January to April, [and] had to give orders to my son and grandchildren." A.R. at 52. She said she carried clothes from the presser to the counter, two to three pounds at a time, for a distance of thirteen feet. Ms. Brewer reported that the heaviest weight she lifted was ten pounds and that the weight she most frequently lifted was also ten pounds. She stated that, in a typical day in her dry cleaning work, she walked one hour, stood six hours, and sat four hours. She claimed her job required frequent bending and constant reaching. Ms. Brewer also stated that she had seen her doctor, Dr. Vaidya, monthly since June 1982. She indicated that her condition first began bothering her in June 1991. At that time she was taking two heart medications, Vaseretic and nitroglycerine, but had not been advised to limit her activities. She had never been hospitalized or tested for her disabling condition and had not seen other doctors for treatment.

#### 2. Medical Evidence

On March 25, 1992, Ms. Brewer's attending physician, Dr. P. Vaidya, reported that Ms. Brewer, whom she had examined a few days earlier, had mild to moderate hypertension, but with no evidence of end organ damage. The physician also reported mild to moderate arthritis, but with no loss of motion in the lower back and no reflex abnormalities, sensory deficits or motor loss. When

---

**2.** Ms. Brewer noted that "falling down at random" and problems in her fingers "run in the family." A.R. at 53.

**3.** Ms. Brewer continued her tax preparation business, however. She testified at the hearing that, in 1993, she earned a gross income of $1,000 preparing tax forms.

asked whether the claimant has a heart condition, the physician commented that Ms. Brewer has angina and, perhaps once every two weeks, suffers from a retrosternal pain, radiating to her left arm, that is associated with exertion. According to Dr. Vaidya, the claimant wears a Nitro–Patch and has no history of myocardial infarction. Dr. Vaidya noted that no EKGs had been performed on Ms. Brewer. The physician added that Ms. Brewer is somewhat obese.

On November 27, 1992, Dr. Vaidya provided an updated report that included the diagnosis of new onset diabetes.[4] She explained, however, that Ms. Brewer's compliance with therapy was good and that there were no vascular, visual or retinal complications and no abnormality of gait, station, dexterity or motor function. The form thrice requested an assessment of the patient's ability to do work-related activities such as sitting, standing and lifting. Dr. Vaidya drew a line through the space provided for her comment.

At the request of a disability claims examiner, two electrocardiograms were taken, one measuring Ms. Brewer's resting heart rate and one measuring it after she had walked on a treadmill. In May 1992 two doctors interpreted the resting EKG. Each noted a normal sinus rhythm and normal PR and QRS intervals but an abnormality in the nonspecific T-wave changes. Dr. Gordon more specifically pointed out some "non-specific ST–T wave changes in the inferolateral leads and poor wave progression in V1 and V2." A.R. at 68–69. In June 1992, the exercise EKG stress test Ms. Brewer took was interpreted as "negative" and "inconclusive"; it was discontinued before the target heart rate was

reached "because the blood pressure rose inappropriately at a low level of exercise" and because Ms. Brewer complained of chest discomfort. A.R. at 73. A thallium exercise test was recommended but not given to Ms. Brewer.

Two physicians reviewing Ms. Brewer's medical records for the Commissioner assessed her residual physical functional capacity. Drs. Kim and Jimenez each reported that Ms. Brewer could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently and that she could stand and/or walk for six hours of an eight-hour work day. This assessment reflects that Ms. Brewer has the capacity for moderate exertional level work. They agreed that there were no push-pull, postural, manipulative, visual, communicative or environmental limitations. They opined that she frequently could climb ramps and stairs, stoop, kneel, crouch and crawl. Indeed, the only activity they believed she could not do was to climb a ladder, rope or scaffold. Neither these doctors nor Ms. Brewer's treating physician offered an opinion that Ms. Brewer was disabled in any way.

### 3. Administrative Hearing

At the hearing conducted January 10, 1994, ALJ Donald C. Niersbach asked Ms. Brewer about her dry cleaning business. When he inquired whether Ms. Brewer had employees, she responded that her children (she may have meant grandchildren) relieved her for a couple of hours after school and that a tailor or seamstress helped her. Her son also worked with her; however, he had taken another job rather than take over her business.[5] Ms. Brewer described the exer-

---

4. The remainder of that report reflects little change in Ms. Brewer's condition: Her most recent blood pressure was 1608. 0, and there were no cardiac enzymes or other evidence of heart disease except her complaint of chest pains lasting a few seconds and now occurring three times per week when walking or physically working. The ache is relieved by rest and nitroglycerin.

On August 29, 1992, Ms. Brewer had filed a reconsideration disability report stating that she now was a diabetic and slept a lot. On January 11, 1993, she filed another statement indicating that there had been no further change in her condition or her daily activities since her request for reconsideration was filed.

5. In her DIB application, filed February 12, 1992, Ms. Brewer stated that her thirty-three year-old son had taken over the dry cleaning business for her on February 8, 1992. He had been in the dry cleaning business since he graduated from high school and had worked with her off and on. When he had another job, she ran the business herself: "The business is small enough that it takes only one person to run it." A.R. at 28. He started working with her again a year ago, and now that he is taking over the business she "will not work in the business anymore." Id. At the hearing on January 10, 1994, however, she testified that her son went to work somewhere else and she closed the business.

tion involved in the dry cleaning process: She would lift twenty to thirty pounds of damp or wet clothes into the dryer and would press those clothes with a pressing machine that was heavy to use. She later testified that the greatest weight she now can lift is a gallon of milk (which, according to the ALJ, weighs 8.3 pounds) from the refrigerator to the table. However, she explained that she never lifts or carries any groceries because the store employees, her daughters and grandchildren always help her.

Ms. Brewer also testified that, when she closed the dry cleaning business, she still used the store to prepare tax forms. Her tax preparation business involved working three days a week during tax season. She earned a gross income of $1000 in 1993 in that work.

Two years before the hearing, Ms. Brewer felt "something sharp" from her shoulder down to her arm. Dr. Vaidya diagnosed it as a heart problem and started her on nitroglycerine pads. Ms. Brewer has no pain when she is lying down or sitting, and she can stand for five to ten minutes with no difficulty. When Ms. Brewer testified that she was hospitalized in Holy Cross Hospital for two days in 1993, as the result of a fall caused by dizziness, the ALJ noted that those hospital records had not been submitted with Ms. Brewer's other medical evidence and asked that they be forwarded to the court. The ALJ concluded his examination of Ms. Brewer by reviewing her medications and by ascertaining what she could do (bend at the waist, reach over her head, cook, dust, make her bed) and could not do (squat, climb steps, do laundry, vacuum, sweep, mop).

Then Dr. Jakub G. Schlichter, a cardiovascular specialist, questioned Ms. Brewer, particularly about the medical tests taken during her 1993 hospitalization. He was hopeful that a thallium exercise test had been taken or could be ordered, for it would indicate "if there are any significant changes in the coronaries, as well as in the heart muscle when the patient is exercising, which would show if she's completely disabled or not." A.R. at 224. However, Ms. Brewer was unable to tell him about the tests she was given. Therefore, when the ALJ asked Dr. Schli-

chter if he could form an opinion, with a reasonable degree of medical certainty, as to the condition of Ms. Brewer, the doctor answered that he could not form a complete opinion because test results were missing.

At that point, the ALJ asked the medical expert to focus on the medical evidence in the record. The physician found that, although Ms. Brewer's inconclusive exercise EKG results indicated an abnormality, this data could not reveal how much damage was present or what the prognosis was. Then Dr. Schlichter, the ALJ and Ms. Brewer's attorney together re-examined the resting EKG results to determine whether the abnormalities there were severe enough to qualify her for disability benefits. As the ALJ explained, "[I]f the resting electrocardiogram is bad enough to meet one of these things that they've arbitrarily decided shows a severe heart impairment, they allow the benefits." A.R. at 230. While Dr. Schlichter took a break from the hearing to evaluate Ms. Brewer's EKG results, a vocational expert testified. He categorized Ms. Brewer's past dry cleaning work as semi-skilled and within the medium exertional range, and her tax work as sedentary semi-skilled. He opined that she could do clerical or cashier-type work and that there were thousands of such jobs in the local economy.

After a lengthy examination of the resting EKG records and a comparison of those results with the ones listed in the Social Security regulations, Dr. Schlichter obliquely suggested that the EKG did not demonstrate disability. However, he did not state his expert medical opinion concerning Ms. Brewer's disability. The hearing was adjourned with the understanding that Ms. Brewer's counsel would send to the ALJ the missing hospital reports and any interrogatories he wished to put to the doctor, and that the ALJ would forward them to the doctor with his own questions.

B. Administrative Determinations

The ALJ reviewed all the evidence in the record before him. He noted that Ms. Brew-

er presented conflicting testimony [6] and then made this finding of fact concerning Ms. Brewer's lack of credibility:

Claimant's complaints have a basis in the evidence but her other statements such as the weight of the materials she had to lift are impeached by her earlier written statements in which she listed the amounts lifted as well as the amount of time spent sitting, standing and walking in her business which seem more accurate than her testimony at the hearing.

A.R. at 19.

The ALJ also considered Dr. Schlichter's analysis of Ms. Brewer's condition. He reflected on the cardiologist's reticence to offer an opinion as to whether the abnormalities in Ms. Brewer's resting EKG results were severe enough to qualify her for disability benefits.

The strenuous efforts of counsel and the judge were unavailing with the medical expert to obtain an opinion that the claimant on the basis of her resting electrocardiograms met or equalled a listing. Dr. Schlichter fixed on the abnormalities of the incomplete stress test and declared that the claimant needed a Thallium Stress test to determine the status and prognosis of her cardiac abnormalities. It was left that counsel would obtain and submit the records of the hospitalization.... Almost 90 days have passed and no such material has been received.

A.R. at 17. Without a definitive expert opinion from Dr. Schlichter or the additional hospital records from Ms. Brewer, the ALJ made his determination by relying on the evaluations of Dr. Vaidya, "which showed little objectivity," A.R. at 18, and of the two State Agency physicians. He then concluded that Ms. Brewer's impairment restricted her to light work: [7]

[W]e find that the listings were not met or equaled. We acknowledge that there were significant changes shown as interpreted by Dr. Schlichter and find that the claimant due to her combination of impairments is restricted to light work.

A.R. at 18. The ALJ disagreed with the vocational expert's opinion that Ms. Brewer's work in the dry cleaners required moderate, rather than light, exertion. The judge found more accurate Ms. Brewer's written statement that the heaviest weight she lifted was ten pounds. The ALJ concluded:

On the evidence we have the claimant could return to her past work operating her cleaners or work as a clerk receiving and handing out cleaned garments for other cleaners. She could also do the sedentary work as a tax preparer or other simpler work such as inventory control clerk in cleaning or mercantile establishments.

A.R. at 18.

Despite the fact that the ALJ's decision was in final form, he reviewed the hospital medical records belatedly sent by claimant's counsel.[8] That examination revealed no new

---

6. In particular, the ALJ contrasted Ms. Brewer's testimony at the hearing that she lifted twenty to thirty (or thirty to forty) pounds with her written disability statement that she lifted no more than ten pounds and that she carried two to three pounds of clothes from the presser to the counter at a time. In addition, at the hearing she testified that she could stand only five to ten minutes and walk only one-half block; in her disability report she stated that she walked for an hour and stood for six hours. The ALJ also noted that Ms. Brewer testified that she could walk only one-half block but that she was going to walk four blocks from the hearing office to catch a bus home. Finally, the ALJ commented that, although she reported that she was having a throbbing chest pain at the hearing, there was no indication of it in her demeanor.

7. The regulations offer these definitions:
"Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying

of objects weighing up to ten pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.
"Medium Work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(b), (c).

8. The ALJ noted from those records that Ms. Brewer's medications and treatment had remained essentially the same. The records from her two-day hospitalization in February 1993 stated that she suffered from hypertension, diabetes and asthma. The tests indicated no myocardial infarction or stroke and no sustained tachy arrhythmias or brady arrhythmias. Her lung x-rays were benign. The EKGs showed no change in interpretation from the earlier ones in the

medical data, nothing in those records to change the ALJ's original decision. Nevertheless, the ALJ commented that, if counsel wanted to send those records to Dr. Schlichter for his expert opinion, the ALJ would "consider any information that would make a change in this decision." A.R. at 19.

After considering the entire record, the ALJ found that Ms. Brewer has mild hypertension, arthritis, obesity, new onset diabetes mellitus, complaints of angina pectoris, and back pain. This medical evidence, stated the ALJ, does not indicate an impairment or combination of impairments from the Listing of Impairments. According to the ALJ, Ms. Brewer retained the capacity to perform light or sedentary work, including a return to either of her past jobs as an owner and operator of a dry cleaning business or preparer of tax forms. In addition, she has the capacity to work for others doing that same type of work as long as it does not require more than light exertional activities. The ALJ noted her other work skills of tax preparation and bookkeeping and found that Ms. Brewer presently was employed gainfully, earning about $1000 annually preparing simple tax forms, and that her work skills can be applied to other work as well as to her past relevant work. The ALJ concluded that Ms. Brewer was not disabled. The Appeals Council denied review; therefore, the ALJ decision became the final one.

## C. Judicial Determination

The district court reviewed the administrative record and concluded that the ALJ's decision was supported by substantial evidence in that record. See Brewer v. Chater, 910 F.Supp. 1335, 1342 (N.D.Ill.1995). The court specifically upheld the ALJ decision to credit Ms. Brewer's earlier statements in her written disability report, which qualified her dry cleaning job as light work, rather than her later testimony at the hearing, which qualified the dry cleaning business as medium exertional work. It also found that the ALJ satisfied his obligation to make specific findings of fact when he determined that Ms.

Brewer possessed the residual functional capacity for a full range of light work. Finally, the district court concluded that the ALJ adequately developed the record "and was entitled to presume that Ms. Brewer had made her best case." Id. at 1343. The court then granted summary judgment to the Commissioner.

## II

## DISCUSSION

### A. The Statutory Framework

■ The Social Security Act, at 42 U.S.C. § 405(g), establishes that the Commissioner's findings as to any fact are conclusive if they are supported by substantial evidence. Our review on appeal focuses not on whether Ms. Brewer is disabled but on whether the Commissioner's findings were supported by substantial evidence. See Diaz v. Chater, 55 F.3d 300, 305 (7th Cir.1995). "Substantial evidence" means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). In our substantial evidence determination, we review the entire record; however, we do not substitute our judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. See Diaz, 55 F.3d at 305, 308; Luna v. Shalala, 22 F.3d 687, 689 (7th Cir.1994); Cass v. Shalala, 8 F.3d 552, 555 (7th Cir. 1993).

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

record. The echocardiogram confirmed that there was left ventricular hypertrophy but with good ventricular contractility. Ms. Brewer's

heart valves functioned well; there was no pericardial effusion. She was discharged in stable condition.

continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." *Id.* at § 404.1520(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* at § 404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations (20 C.F.R. § 401, pt. 404, subpt. P, app. 1). If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. *Id.* at § 404.1520(e). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant—in light of his age, education, job experience and functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

In this case, the ALJ determined that Ms. Brewer could perform her past relevant work and therefore denied her DIB application at the fourth step in the sequential process.

## B. *Ms. Brewer's Past Relevant Work: Step Four*

The ALJ found that Ms. Brewer retained the capacity for performing light work and that she could return to her past relevant work as a dry cleaner owner-operator or tax form preparer. According to Ms. Brewer, that finding was not supported by substantial evidence on two grounds.

### 1.

■ Ms. Brewer first submits that a claimant's previous work must rise to the level of "substantial gainful activity" in order to be considered "past relevant work." Ms. Brewer points out that she earned less than $1,000 annually in her job as a tax return preparer and asserts that that work did not rise to the level of "substantial gainful activity" because it did not meet the minimum threshold of pay to be considered "gainful" pursuant to 20 C.F.R. § 404.1574(b)(3).

By basing her argument on § 404.1574(b)(3), Ms. Brewer mischaracterizes her previous work as a tax return preparer. Section 404.1574(b)(3), entitled "Earnings that will ordinarily show that you have not engaged in substantial gainful activity," refers to earnings of an employee. However, as of 1980 Ms. Brewer was self-employed with respect to both her tax and dry cleaning businesses. The pertinent regulations provide that the measure of "substantial gainful activity" for a self-employed person is that person's activities and their value, not her income alone. 20 C.F.R. § 404.1575.[9] Clearly Ms. Brewer's seasonal tax preparation work, conducted between January and April of each year, was for those months a valuable activity—both "gainful" (work activity done for profit, *see* 20 C.F.R. § 404.1572(b)) and "substantial" (work activity involving significant physical or mental activities, *see* 20 C.F.R. § 404.1572(a)). In fact, the regulation defining "substantial gainful activity," § 404.1572, states that part-

9. 20 C.F.R. § 404.1575, in pertinent part, provides:

**Evaluation guides if you are self-employed.**
(a) *If you are a self-employed person.* We will consider your activities and their value to your business to decide whether you have engaged in substantial gainful activity if you are self-employed. We will not consider your income alone since the amount of income you actually receive may depend upon a number of different factors . . . .

20 C.F.R. § 404.1575.

time work may be considered substantial. *See Wolfe v. Shalala,* 997 F.2d 321, 324 (7th Cir.1993) (finding that claimant's part-time work as automobile salesman two afternoons a week constituted substantial gainful activity); *cf. Pass v. Chater,* 65 F.3d 1200, 1207 (4th Cir.1995) (affirming ALJ ruling that claimant's short-term job as gate guard, which ended five months later when construction was completed, is his past relevant work, even though the job no longer exists).

However, it is noteworthy that, in this case, the ALJ labelled Ms. Brewer's tax preparation work "gainful activity," not "substantial gainful activity." It was her past work as the owner-operator of the dry cleaning business, work which involved the type of physical exertion that Ms. Brewer claims she no longer can do, on which the ALJ focused as her "substantial gainful activity." Ms. Brewer does not dispute that her dry cleaning job was substantial gainful activity. We therefore conclude that Ms. Brewer's first contention is without merit and turn to her other allegation.

### 2.

Ms. Brewer next contends that substantial evidence supports her claim that the dry cleaning job was "medium" work, not "light," as the ALJ found. Ms. Brewer and the vocational expert testified that it was medium work. The Department of Labor's Dictionary of Occupational Titles ("DOT") characterizes the job of dry cleaner with a medium strength rating. However, Ms. Brewer submits that the ALJ erroneously found that her job was light work because her disability report stated that the heaviest weight she lifted was ten pounds and be-

cause she had help (a seamstress, her children and grandchildren) doing the work in her dry cleaning business.[10] She also asserts that the ALJ did not consider her past work carefully or evaluate its specific demands when determining that she could return to work. Instead, he gave a conclusory finding that her past work was light.

■ The record does not support this allegation. Indeed, our review indicates that the ALJ conducted a careful and complete evaluation of the physical demands of Ms. Brewer's job at the hearing. In his decision, the ALJ incorporated the descriptions of Ms. Brewer's dry cleaning work from her initial Disability Report and from her testimony at the hearing. However, when he compared such information as the heaviest weight she lifts or the amount of time she spends sitting, standing and walking, the ALJ found Ms. Brewer's testimony at the hearing to be contrary to her written statements. He explicitly found that Ms. Brewer's earlier written statements were more accurate descriptions of her actual work than her later testimony. It is the responsibility of the ALJ, not of a reviewing court, to resolve conflicting evidence and to make credibility determinations. An ALJ's credibility ruling will not be disturbed unless it is patently wrong. *Diaz,* 55 F.3d at 308. The ALJ's crediting of Ms. Brewer's contemporaneous statements concerning her job duties and his discounting of her later statements at the hearing were proper.[11] Moreover, the ALJ's finding that Ms. Brewer's past work, as the owner and operator of her own dry cleaning establishment, was light work is supported by substantial evidence in the record.

---

10. Ms. Brewer submits that the record reflects that her only employee was a seamstress. However, the record also contains Ms. Brewer's statements that the business needed only one person to run it, and that she had help from her family—from the children, who took over for several hours after school, and from her son, who had worked with her "off and on" for years and throughout the last year Ms. Brewer ran the business. Moreover, the ALJ was not patently wrong in finding that, because Ms. Brewer ran the dry cleaning business and the tax preparation business at the same time for years, one could infer "that she operated the cleaners (and could

continue to do so) by the use of employees." A.R. at 20. Whether they were actually "employees" or not is of no consequence in our consideration of her capacity to return to either of her past jobs.

11. *See Limberopoulos v. Shalala,* 17 F.3d 975, 978–79 (7th Cir.1994) (approving ALJ's discrediting of claimant's testimony and crediting of his disability report); *Anderson v. Sullivan,* 925 F.2d 220, 222 (7th Cir.1991) (finding that the ALJ was entitled to give more weight to contemporaneous medical evidence than to medical opinions rendered in hindsight).

■ Ms. Brewer's reliance on the DOT characterization of her job is also misplaced. In the first place, neither Ms. Brewer nor the vocational expert presented the DOT definition of "dry cleaner" to the ALJ for his consideration. Nor was this issue presented to the Appeals Council. Ms. Brewer's failure to raise the assertion administratively constitutes waiver. *Papendick v. Sullivan*, 969 F.2d 298, 302 (7th Cir.1992) (declining to consider issues not considered by the Appeals Council), *cert. denied*, 506 U.S. 1050, 113 S.Ct. 968, 122 L.Ed.2d 124 (1993).

■ However, even if Ms. Brewer had raised the DOT definition as proof that her job required medium strength, she would not have prevailed. In order for Ms. Brewer to show, at step four, that she was unable to perform her past work, she was required to prove she did not have the residual functional capacity to perform the functional demands and duties of her past job *either* as she actually performed the job *or* as was generally required by employers throughout the national economy.[12] The DOT is a recognized source of vocational evidence of which an ALJ may take notice when deciding what a typical job description is in the national economy.[13] "It describes the mental and physical requirements of a variety of jobs as those jobs are generally performed in the national economy." *Wolfe v. Shalala*, 997 F.2d 321, 323 (7th Cir.1993). Nevertheless, when deciding whether Ms. Brewer was capable of performing the dry cleaning job, the ALJ focused on the physical and mental capabilities of Ms. Brewer, not on the job as it was generally performed in the economy. The ALJ found that her "work in the cleaning business although involving long hours was light in exertional effort." A.R. at 20. Having made that finding based on the actual functional demands and job duties of her particular past job, the ALJ did not need to consider the DOT classification of that job.[14]

The ALJ's step four determination that Ms. Brewer's past relevant work as a dry cleaner was light work, based on his finding that Ms. Brewer's statements in her disability report were credible,[15] was not patently wrong in view of the administrative record as a whole.[16]

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

**AFFIRMED**

---

**12.** *See Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir.1988); *Steward v. Bowen*, 858 F.2d 1295, 1300–01 (7th Cir.1988); *Garcia v. Secretary*, 46 F.3d 552, 556–57 (6th Cir.1995); Social Security Ruling 82–61.

**13.** *See Anderson v. Bowen*, 868 F.2d 921, 925 n. 11 (7th Cir.1989); *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir.1996); 20 C.F.R. § 404.1566(d)(1).

**14.** *See Pass v. Chater*, 65 F.3d 1200, 1206–07 (4th Cir.1995) (finding that the claimant could perform his job as he did in the past and deciding it was thus unnecessary to determine whether claimant could perform the job as classified in the DOT and as it currently exists in the national economy); *Garcia*, 46 F.3d at 559 ("conclud[ing] that the Secretary's exclusion of vocational considerations from step four's determination of a claimant's ability to do past work ... is a permissible construction of the Act and is therefore entitled to deference"); *cf. Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir.1993) (using DOT definitions as a source of information when making a finding as to job requirements and weighing that information along with claimant's testi-

mony concerning the actual functional demands of the job); *Jones*, 86 F.3d at 826 (noting that "[t]he ALJ must be careful not to characterize the specific work a claimant performed too broadly by using a generic job description").

**15.** The ALJ specifically noted the evidentiary conflict between Ms. Brewer's written statements in the disability report and her testimony, and expressly disagreed with the vocational expert's assessment that she did *moderate* exertional level work.

**16.** Ms. Brewer also submits that she is unable to perform any other work in the national economy. The district court concluded that the ALJ determination on step four was supported by substantial evidence. It therefore declined to consider whether, under step five, Ms. Brewer could perform other jobs. Because there is substantial evidence to support the ALJ's finding at step four that Ms. Brewer is not disabled, we also agree that no further review is required. 20 C.F.R. § 404.1520(a) ("If we can find that you are disabled or not disabled at any point in the review, we do not review your claim further.").